

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NR:VTN

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 28, 2020

By ECF

Honorable Edward R. Korman
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re: United States v. Serge Edouard
> Criminal Docket No. 05-0400 (ERK)

Dear Judge Korman:

The government respectfully submits this letter in response to Serge Edouard's pro se Emergency Motion under the Extraordinary Dangerous Nature of the Covid-19 Outbreak among Federal Prison Population ("Def. Mot."). ECF Dkt. No. 38. The Defendant Serge Edouard (hereinafter "Defendant") has filed a motion asking this Court to release the defendant from custody based on a claimed vulnerability to COVID-19 and to allow him to serve his sentence in home confinement. The government respectfully opposes the motion as the Defendant has not met his burden of establishing that a sentence reduction is warranted under the statute.

## FACTUAL BACKGROUND

I. Procedural History

On February 25, 2008, the Defendant was convicted of conspiring to import cocaine into the United States, in violation of 21 U.S.C. § 963, pursuant to an agreement with the government. On February 9, 2010, the Defendant was sentenced by The Honorable Sandra L. Townes, to 262 months' custody. On December 13, 2019, the Defendant filed a motion to reduce his sentenced pursuant to Amendment 782 under 18 U.S.C. § 3582. ECF Dkt. No. 35. On May 21, 2020, the Court issued an order granting the Defendant's motion and indicated that the Court intends to resentence the Defendant to a term of 210 months' imprisonment. The Defendant is also serving a 240-month sentence from the Southern District of Florida, which was imposed on February 28, 2018, pursuant to an amended judgment reducing a sentence that was originally imposed in 2005. United States v. Edouard, 05-CR-20355 (KMM) (S.D.Fla.) (the "Florida Case"). The instant sentence is running concurrently to the sentence in the Florida

Case. He is presently scheduled to be released from the custody of the Bureau of Prisons ("BOP") on August 6, 2027, but that date can be expected to move forward once the Defendant is resentenced to a term of 210 months' imprisonment.

In or about May 2020, the Defendant filed a request to the warden of the Federal Correctional Institution at North Lake ("FCI North Lake") in Baldwin, Michigan, for compassionate release under 18 U.S.C. § 3582. On May 11, 2020, the BOP denied the Defendant's request for a compassionate release and identified specific factors that went into its decision, including the following: (i) the Defendant had not identified extraordinary or compelling circumstances; (ii) the nature of the offense identifies a disregard for public safety and the community; (iii) a detainer has been lodged against the Defendant by Immigration and Customs Enforcement ("ICE") for investigation of possible deportation; (iv) the Defendant has not provided a verifiable release plan; and (v) the Defendant has only served 57.5% of his sentence. Government Exhibit A.

On or about May 4, 2020, the Defendant filed a similar petition to be released to home confinement under "the CARES Act Confinement Provision." The BOP similarly denied that request for home confinement in a letter dated May 14, 2020, stating that the Defendant is classified as a deportable alien and therefore not appropriate for home confinement. Government Exhibit B.

the Defendant now moves under 18 U.S.C. § 3582(c)(1)(A) for a sentence reduction resulting in his immediate release from the custody of the BOP, relying on the threat posed by the COVID-19 pandemic. The Defendant makes no reference to the denials of compassionate release or home confinement by the BOP nor to any appeal filed on his behalf with the BOP. The Defendant also filed a substantially identical to the motion for compassionate release in the Florida Case. That motion is still pending.

In a letter dated May 19, 2020, the Defendant notified the Court that he had tested positive for COVID-19, and asked to be deported to Haiti. The Defendant has not identified any other medical condition or diagnosis that places him at greater risk than others who may be infected by the virus. The Defendant's medical records (as of May 14, 2020) confirm that he tested positive for COVID-19 on or about May 8, 2020, and is no longer displaying symptoms of COVID-19 nor exhibiting signs of distress. Government Exhibit C. Between March 24, 2020 through May 14, 2020, the Defendant's body temperature peaked at 99.3° Fahrenheit on May 8 and 9, and it returned to normal by May 10th. Id. at 3-4. Since May 9, 2020, after he had been swabbed for a COVID-19 test due to reports of nausea and headache, the Defendant has exhibited unlabored, regular breathing, and he reported that he was feeling "good" in the two most recently documented medical evaluations. See id. at 8-23.

II.     The BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, the BOP has taken significant measures to protect the health of the inmates in its charge.

The BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.BOP.gov/resources/news/20200319_covid19_update.jsp.

Indeed, the BOP has had a Pandemic Influenza Plan in place since 2012. The BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.BOP.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." Id. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, the BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, the BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, the BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 1, 2020, the BOP implemented Phase Five of the Action Plan, which currently governs operations. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, the BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, such as Philadelphia, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended until at least June 30, 2020, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, the BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of the BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.BOP.gov/coronavirus/index.jsp.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. The BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. The BOP must nonetheless consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, the BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. It must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

APPLICABLE LAW

I.      Exhaustion Under 18 U.S.C. U.S.C. § 3582(c)(1)(A)(i)

Title 18, U.S.C., § 3582(c)(1)(A)(i), commonly referred to as the "compassionate release" statute, permits a court to modify an already imposed sentence upon a showing of "extraordinary and compelling reasons." See United States v. Zullo, 09-CR-64, 2019 WL 7562406, at *1 (D. Vt. Sept. 23, 2019). A motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) may be made by either the BOP or a defendant, but in the latter case only "after the defendant has fully exhausted all administrative rights to appeal a failure of the BOP to bring

a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." Id. (emphasis added). Thus, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment. Id. (emphasis added).

Significantly, Section 3582(c)'s exhaustion requirement is statutory, and thus is not a judicially-crafted exhaustion requirement that "remain[s] amenable to judge-made exceptions." Ross v. Blake, 136 S. Ct. 1850, 1857 (2016). Indeed, statutory exhaustion requirements "stand[] on a different footing." Id. There, "Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to." Id. Where, as here, a statute makes clear that a defendant must show that he has "fully exhausted all administrative rights," the defendant cannot be excused from that obligation. See Booth v. Churner, 532 U.S. 731, 741 n.6 (2001) ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise."); Theodoropoulos v. I.N.S., 358 F.3d 162, 172 (2d Cir. 2004) ("[A]s a general rule, courts are required to strictly enforce statutory exhaustion requirements"); United States v. Gross, No. 15-CR-769 (AJN), 2020 WL 1862251, at *1 (S.D.N.Y. Apr. 14, 2020) ("Faced with unambiguous statutory language requiring exhaustion of administrative remedies, we are not free to rewrite the statutory text." (quoting Bastek v. Fed. Crop Ins. Corp., 145 F.3d 90, 94 (2d Cir. 1998)); cf. Fry v. Napoleon Community Schools, 137 S. Ct. 743, 750 (2017) (stating that statute requiring that certain types of claims "shall be exhausted" is a mandatory exhaustion provision for those types of claims).

Consequently, a court lacks the authority to grant a defendant's compassionate release motion absent exhaustion of the administrative remedies, as numerous courts, including the only Court of Appeals to have addressed the issue, have held.[1] See United States v. Raia, No. 20-1033, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020) (holding that "any remand" to the district court to consider a compassionate release motion "would be futile" in light of the defendant's failure to exhaust, which "presents a glaring roadblock foreclosing compassionate release"); Gross, 2020 WL 1862251, at *2 (finding the exhaustion requirement mandatory but noting disagreement among district courts); United States v. Roberts, No. 18-CR-528 (JMF), 2020 WL 1700032, at *2 (S.D.N.Y. Apr. 8, 2020) (noting that "[c]ourts do have some flexibility

---

[1] While the "Second Circuit has not yet answered the question of whether § 3582(c) is jurisdictional, several courts of appeals" have interpreted it thusly. See, e.g., United States v. Monzon, No. 99-CR-157 (DLC), 2020 WL 550220, at *2 (S.D.N.Y. Feb. 4, 2020) (citing cases); but see United States v. Taylor, 778 F.3d 667 (7th Cir. 2015) (holding that § 3582(c) is not jurisdictional)). In any event, the exhaustion requirement of Section 3582(c)(1)(A), at a minimum, is a mandatory claim-processing rule and must be enforced if, as the government has done here, a party "properly raise[s]" it, Eberhart v. United States, 546 U.S. 12, 16 (2005) (per curiam) (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within 14 days of the verdict, is a non-jurisdictional, but mandatory claim-processing rule). See also, e.g., Monzon, 2020 WL 550220, at *2 (noting that even if the exhaustion requirement is not jurisdictional, it is a "statutory exhaustion requirement" that must be "strictly enforced"); Gross, 2020 WL 1862251, at *4 (finding that the exhaustion requirement was not jurisdictional, but still mandatory as it constitutes a "claim-processing rule").

to disregard exhaustion requirements when they are judicially imposed" but, "[a]s the Supreme Court has emphasized . . . 'a statutory exhaustion provision stands on different footing'" (quoting Ross, 136 S. Ct. at 1857); United States v. Hernandez, No. 19-CR-834 (PAE), 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020) (finding that the compassionate release provisions of the First Step Act did not apply because "Mr. Hernandez does not appear to have sought any such relief within the BOP, let alone exhausted his administrative remedies"); United States v. Cohen, No. 18-CR-602 (WHP), 2020 WL 1428778, at *1 (S.D.N.Y. Mar. 24, 2020) ("As the Government points out, he is 'manifestly ineligible' for compassionate release and has not exhausted his administrative remedies."); United States v. Gileno, No. 19-CR-161 (VAB), 2020 WL 1307108, at *3 (D. Conn. Mar. 19, 2020) ("As a threshold matter, Mr. Gileno has not satisfied the requirement under 18 U.S.C. § 3582(c)(1)(A) to first request that the Bureau of Prisons file a motion on his behalf and then show that thirty days have passed without any BOP action. As a result, the Court cannot consider his motion to modify his sentence."); Monzon, 2020 WL 550220, at *2 (noting that several Courts of Appeals have held that § 3582(c)'s exhaustion requirement is a "jurisdictional bar" to review in the district court, but declining to resolve the issue because even if it not jurisdictional, it is a "statutory exhaustion requirement" that must be "strictly enforced," and the defendant failed to satisfy that requirement); United States v. Bolino, No. 06-CR-806 (BMC), 2020 WL 32461, at *1 (E.D.N.Y. Jan. 2, 2020) ("The submission of a sufficient record to show exhaustion, at least to the extent of the [BOP's] General Counsel's rejection of an appeal, is fundamental to this Court's function in deciding a compassionate release motion. Congress clearly wanted these applications decided at the administrative level if possible.").[2]

Finally, 18 U.S.C. § 3582(c)(1)(A) requires that a defendant "fully exhaust all administrative remedies" within the BOP unless the warden of the inmate's institution fails to act on the inmate's petition (i.e., there is a "lapse") within 30 days. If the warden acts on the inmate's request within 30 days, and denies the request, the inmate must then exhaust his administrative remedies, including administrative appeal to the BOP, as set forth in 28 C.F.R. §§ 542.10–19. Where a defendant has fully and properly exhausted his administrative rights, or the warden has failed to take action on a defendant's request within 30 days, the defendant may then bring a motion for compassionate release before a district court. See United States v. Davis, No. 96-CR-912 (ERK), at 2-4 (May 18, 2020).

II.    Criteria for Compassionate Release

If the exhaustion requirement of Section 3582(c)(1)(A) is met, a court may reduce a defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy

---

[2] But see, e.g., United States v. Zuckerman, No. 16-CR-194 (AT), 2020 WL 1659880, at *2 (S.D.N.Y. Apr. 3, 2020) ("[T]he Court holds that Zukerman's exhaustion of the administrative process can be waived in light of the extraordinary threat posed—in his unique circumstances—by the COVID-19 pandemic."); United States v. Perez, No. 17-CR- 513 (AT), 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (finding that exceptions to the exhaustion requirement apply, emphasizing that the defendant's three week sentence would expire before the exhaustion period ends).

statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i).  As the movant, a defendant bears the burden to establish that he or she is eligible for a sentence reduction. United States v. Jones, 836 F.3d 896, 899 (8th Cir. 2016); United States v. Green, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A).  As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement."  USSG § 1B1.13.2.

The policy statement refers only to motions filed by the BOP Director.  That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c).  See First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; cf. 18 U.S.C. § 3582(c) (2012).  In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons."  First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i).  Second, the standard is met if the defendant is:

(I)   suffering from a serious physical or medical condition,
(II)  suffering from a serious functional or cognitive impairment, or
(III) experiencing deteriorating physical or mental health because of the aging process

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii).  The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C).  Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons."  USSG § 1B1.13, cmt. n.1(D).

ARGUMENT

This Court should deny the Defendant's motion for a reduction in his sentence without prejudice because he has failed to exhaust administrative remedies.  Should the Court

reach the merits of his motion, the Court should deny it with prejudice on either of two independently sufficient grounds.  First, the Defendant has not established that "extraordinary and compelling reasons" support a sentence reduction.  Second, the Defendant has not met his burden to show that a reduction is warranted in light of the danger that the Defendant would pose to the community and the relevant § 3553(a) factors.  In addition, this Court lacks statutory authority to grant the Defendant's alternative request to direct the BOP to him to home confinement or to order his deportation to Haiti.

I.      the Defendant Has Not Exhausted Administrative Remedies

Prior to seeking relief from this Court, the Defendant must "fully exhaust" his administrative remedies with the BOP.  18 U.S.C. § 3582(c)(1)(A)(i).  He has failed to do so.  As noted above, the Defendant's request to the warden of FCI North Lake for compassionate release was denied on or about May 11, 2020.  The Defendant has not commenced the appeals process within the BOP, which is necessary to exhaust his administrative remedies.  Accordingly, the Defendant's motion should be denied without prejudice to refiling once he has exhausted administrative remedies.  This Court lacks authority to act on the Defendant's motion for a sentence reduction at this time.

II.     the Defendant Has Failed to Present "Extraordinary and Compelling Reasons"
        Warranting a Sentence Reduction

Should the Court nonetheless reach the merits of the Defendant's motion, the Defendant's request for a sentence reduction should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting his release.  As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).  The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A).

To state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement.  Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  USSG 1B1.13, cmt. n.1(A).  If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into either of the specified categories and therefore could not alone provide a basis for a sentence reduction.  The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population.  As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify

compassionate release." Raia, 2020 WL 1647922 at *2; see also Eberhart, 2020 WL 1450745 at *2 ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).").[3] To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to the BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria employed by the BOP to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals – not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

       That does not mean, however, that COVID-19 is irrelevant to a court's analysis of a motion under § 3582(c)(1)(A). If an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19,[4] that condition may satisfy the standard of "extraordinary and compelling reasons." Under these circumstances, a chronic condition (i.e., one "from which [the defendant] is not expected to recover") reasonably may be found to be "serious" and to "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19. USSG § 1B1.13, cmt. n.1(A)(ii)(I). But as part of its analysis of the totality of circumstances, the Court should consider whether the inmate is more likely to contract COVID-19 if he or she is released than if he or she remains incarcerated. That will typically depend on the inmate's proposed release plans and whether a known outbreak has occurred at his or her institution.

       In this case, the Defendant has already contracted COVID-19 and has successfully undergone treatment in the institution. There is no suggestion that the condition is terminal and releasing the Defendant will not give him the relief that he seeks, that is, avoiding the virus he has already contracted. As such, he reasons given for the Defendant's compassionate release are

---

[3] See also, e.g., United States v. Coles, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); United States v. Okpala, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); United States v. Weeks, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); United States v. Haney, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); United States v. Pinto-Thomaz, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); United States v. Korn, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere possibility of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); United States v. Carver, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

[4] See Centers for Disease Control, At Risk for Severe Illness, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last modified Apr. 2, 2020).

now moot. Moreover, since he has tested positive for COVI-19, there is now a risk that he could infect members of the community with the virus.

Even if this Court concludes (contrary to the argument set forth above) that the Defendant has established "extraordinary and compelling reasons" for a sentence reduction based on the risk of contracting COVID-19 a second time, the Defendant has not established that he would be less vulnerable to COVID-19 if he were to be released. In fact, due to the ICE detainer in place, the Defendant would merely be transferred to an immigration facility where his risk of re-infection would remain unchanged. Therefore releasing the defendant would not address the risks which the Defendant seeks to avoid under the current circumstances.

Because he does not establish "extraordinary and compelling reason" for a sentence reduction under § 3582(c)(1)(A), the Defendant's motion cannot be granted.

III.  This Court Lacks the Authority to Direct the BOP to Place the Defendant in Home Confinement or to Order the Defendant's Deportation

the Defendant has also asked in the alternative that this Court order BOP to place him on home confinement. That request should be denied because this Court has no authority to direct the BOP to place a defendant in home confinement. Rather, such designation decisions are committed solely to BOP's discretion.

Once a sentence is imposed, the BOP is solely responsible for determining an inmate's place of incarceration. See 18 U.S.C. § 3621(b); Moore v. United States Att'y Gen., 473 F.2d 1375, 1376 (5th Cir. 1973) (per curiam); see also McKune v. Lile, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). A court has no authority to designate a prisoner's place of incarceration. United States v. Voda, 994 F.2d 149, 151-52 (5th Cir. 1993). Because the Defendant's request for home confinement alters only the place of incarceration, not the actual term of incarceration, only the BOP may grant or deny his request.

Moreover, there is no constitutional or statutory authority that allows the Court to order home confinement. A prisoner has no constitutional right to confinement in any particular place, including in home confinement. See Sandin v. Conner, 515 U.S. 472, 478 (1995) ("the Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); Meachum v. Fano, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in any of its prisons."). Following the imposition of sentence, the Court has limited jurisdiction to correct or modify that sentence absent specific circumstances enumerated by Congress in 18 U.S.C. § 3582. United States v. Garcia, 606 F.3d 209, 212 n.5 (5th Cir. 2010) (per curiam). Section 3582(c) contemplates only a reduction in sentence. See 18 U.S.C. § 3582(c). But the Defendant's request to serve the rest of his term in home confinement, as opposed to prison, in not a reduction to his sentence. Home confinement merely permits the inmate to serve out his term of imprisonment at home. The Defendant's request for such relief therefore falls outside § 3582(c)'s limited grant of authority to this Court to modify a sentence post-conviction. Because § 3582(c) deprives the Court of jurisdiction to grant home confinement and because the

Defendant offers no other statutory authority to support his request for such relief, this Court has no authority to act on his request for such relief in this forum.[5]

the Defendant alternatively requests that the Court order his removal to Haiti. The authority to order a defendant deported as a result of a criminal conviction is governed by 8 U.S.C. § 1228, and without a request from the United States Attorney and the concurrence of the Commission of Immigration and Naturalization, which are both absente here, the Court lacks authority to issue such an order. See 8 U.S.C. § 1228(d)(1). Accordingly, the alternative forms of relief requested by the Defendant are not available.

## CONCLUSION

In light of the above, the government respectfully asks the Court to deny the Defendant's motion.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:   /s/ Virginia Nguyen
Virginia Nguyen
Special Assistant U.S. Attorney
(718) 254-6280

cc:   Clerk of the Court (by ECF)
      Mildred Whalen, Esq. (by ECF)

---

[5] If a court grants a sentence reduction, it may "impose a term of . . . supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." § 3582(c)(1)(A). In imposing a term of supervised release, the court may impose a period of home confinement as a condition of supervised release, provided that the court finds that home confinement is a "substitute for imprisonment." USSG § 5F1.2; see 18 U.S.C. § 3583(d). Alternatively, a court may consider modifying an existing term of supervised release to add a period of home confinement, consistent with USSG § 5F1.2. See § 3583(e)(2).